UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MAHTAB ARSANJANI, | |
| *Plaintiff*, | |
| v. | Civ. A. No. 19-01746 (JEB) |
| UNITED STATES OF AMERICA, *et al.* | |
| *Defendants*. | |

**DEFENDANT UNITED STATES OF AMERICA'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Federal Rule of Civil Procedure 56, Defendant United States of America hereby respectfully moves for summary judgment as the record in this case shows there is no genuine dispute of any material fact that exists as to the negligence claim made by Plaintiff Mahtab Arsanjani.  In support of this Motion, Defendant respectfully refers the Court to the accompanying Memorandum of Points and Authorities, Statement of Material Facts, and Exhibits.  A proposed order is also attached.

*        *        *

Dated:  November 21, 2022

Respectfully submitted,

MATTHEW M. GRAVES
D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

 /s/ Stephanie R. Johnson
STEPHANIE R. JOHNSON
D.C. Bar No. 1632338
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7874
Stephanie.Johnson5@usdoj.gov

*Counsel for Defendant the United States*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAHTAB ARSANJANI,

       *Plaintiff*,

    v.

UNITED STATES OF AMERICA, *et al.*

       *Defendants*.

Civ. A. No. 19-01746 (JEB)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

Table of Contents....................................................................................................... i

Table of Authorities ................................................................................................... ii

List of Exhibits........................................................................................................... iv

Introduction................................................................................................................. 1

Factual and Procedural Background .......................................................................... 3

Legal Standards.......................................................................................................... 8

Argument .................................................................................................................... 12

    I.     Plaintiff's Expert Report and Testimony Should be Excluded Because Both Fail to Meet the Standards Set Forth in Fed. R. Evid. 702................................................ 12

    II.    Plaintiff Cannot Establish That the Smithsonian Breached the Standard of Care, and Her Claim Fails as a Matter of Law ................................................................ 23

    III.   The Smithsonian's Maintance Records and Expert Report Establish Its Execise of Reasonable Care, Which Plaintiff Cannot Rebut.................................................. 24

Conclusion .................................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>                                                                                       <u>**Page**</u>

*Ambrosini v. Labarraque,*
101 F.3d 129 (D.C. Cir. 1996) ........................................................................... 11-12

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................................9

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................................8

*Clark v. District of Columbia,*
708 A.2d 632 (D.C. 1997) ....................................................................................17

*Beard v. Goodyear Tire & Rubber Co.,*
587 A.2d 195 (D.C. 1991) ....................................................................................11

*Blumenthal v. Cairo Hotel Corp.,*
256 A.2d 400 (D.C. 1969) ....................................................................................10

*Briggs v. Wash. Metro. Area Transit Auth.,*
481 F.3d 839 (D.C. Cir. 2007) ...................................................................11, 16, 19

*Campbell v. Nat'l R.R. Passenger Corp.,*
311 F. Supp. 3d 281 (D.D.C. 2018) ......................................................................15

*Carmichael v. West,*
Civ. A. No. 12-1969 (BAH), 2015 WL 10568893 (D.D.C. Aug. 31, 2015) ...........11, 23

*Cope v. Scott,*
45 F.3d 445 (D.C. Cir. 1995) ...............................................................................10

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993) .......................................................................................... 11-12

*District of Columbia v. Arnold & Porter,*
756 A.2d 427 (D.C. 2000) ....................................................................................11

*District of Columbia v. Hampton,*
666 A.2d 30 (D.C. 1995) ......................................................................................11

*FDIC v. Meyer,*
510 U.S. 471 (1994) ..............................................................................................10

*Katkish v. District of Columbia,*
763 A.3d 703 (D.C. 2000) ................................................................................. 11-12

*Laningham v. U.S. Navy*,
813 F.2d 1236 (D.C. Cir. 1987)) ................................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ....................................................................................................9

*Pannell v. District of Columbia*,
829 A.2d 474 (D.C. 2003) ........................................................................................19

*Philips v. District of Columbia*,
714 A.2d 768 (D.C. 1998) ........................................................................................19

*Sandoe v. Lefta Assocs.*,
559 A.2d 732 (D.C. 1988) ........................................................................................10

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994) .....................................................................................8

*Travers v. D.C.*,
672 A.2d 566 (D.C. 1996) ........................................................................................23

*Tri-State Hosp. Supply Corp. v. United States*,
341 F.3d 571 (D.C. Cir. 2003) .................................................................................10

*United States v. King*,
395 U.S. 1 (1969) ........................................................................................................9

*United States v. Mitchell*,
445 U.S. 535 (1980) ....................................................................................................9

*United States v. Orleans*,
425 U.S. 807 (1976) ..................................................................................................10

*Varner v. District of Columbia*,
891 A.2d 260 (D.C. 2006) .............................................................................10, 16, 19

*Walen v. United States*,
Civ. A. No. 15-1718, 2019 WL 4261160 (D.D.C. Sep. 9, 2019) .............................21

## Statutes, Regulations, Rules, and Other Authorities

28 U.S.C. § 1346 .......................................................................................................10

28 U.S.C. §§ 2671-2680 .............................................................................................1

Fed. R. Civ. P. 56 ...............................................................................................8-9, 26

Fed. R. Evid. 702 ................................................................................................. 11-12

## <u>LIST OF EXHIBITS</u>

Exhibit A - Def.'s Resp. to Pl.'s Interrog.

Exhibit B - Smithsonian Gardens Grounds Manual, Sec. 4 "Trees, Shrubs and Ground Covers"

Exhibit C - Management of the Smithsonian Gardens Tree Collection

Exhibit D - Smithsonian Gardens Tree Care and Maintenance Procedures

Exhibit E - Dep. of Gregory Huse

Exhibit F - Elm Maintenance Log (2000-2016)

Exhibit G - After Action Report (June 19, 2016)

Exhibit H - Russell Carlson Expert Report

Exhibit I - Lew Bloch Expert Report

Exhibit J - Dep. of Lew Bloch (July 27, 2022)

Exhibit K - June 19, 2016, Smithsonian Institution Office of Protection Protective Services ("OPS") Incident Report

Exhibit L – *Walen* Expert Report

## INTRODUCTION

Plaintiff Mahtab Arsanjani ("Plaintiff") brings this action against Defendant United States of America (the "United States") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680. Plaintiff was visiting the Smithsonian Institution's ("Smithsonian") National Museum of Natural History (the "Museum") in June 2016 when she was allegedly struck by a tree branch that failed and fell from an elm tree located on Museum property. Plaintiff seeks damages in the amount of $5 million.

Plaintiff's negligence claim must fail because she cannot prove a breach of, or deviation from, an applicable and defined standard of care. Smithsonian maintenance records demonstrate that the tree was carefully monitored and maintained according to nationally accepted tree maintenance and tree risk assessment standards. The Smithsonian engaged outside tree care experts in 2001 and 2010 to assess the tree, including performing an advanced internal decay detection test on the tree in 2001, and implemented all the consultants' recommendations. In addition, the Smithsonian's full-time certified arborist and qualified tree risk assessor Gregory Huse visually assessed the tree every time he was in its proximity and performed a comprehensive risk and health inspection in 2014. The Smithsonian again followed all of Mr. Huse's recommendations in the years between his inspection and the incident. Plaintiff has presented no evidence disputing the Smithsonian's care and maintenance of the tree.

The Smithsonian's expert Russell Carlson is a board-certified master arborist, registered consulting arborist, and qualified tree risk assessor. Before issuing his report, he reviewed Smithsonian Gardens tree care policies, deposition testimony, Smithsonian maintenance records for the elm, and the "After Action Report" prepared by Mr. Huse following the incident that detailed the elm's history, the limb failure event, and its immediate aftermath. Mr. Carlson's expert report concluded that the Smithsonian acted properly in its assessment and care of the tree.

He also concluded that the Smithsonian followed an established protocol, monitored the tree regularly, and based its maintenance decisions on current industry guidance and standards for the care and assessment of trees.

Plaintiff's expert Lew Bloch, who had not renewed his tree risk assessment qualification at the time of his report, opines that the Smithsonian was negligent because it had failed to identify and address a tree limb that he alleges was too long with excessive end weight and poor taper, thus causing the failure. However, Mr. Bloch's opinion that the Smithsonian was negligent in maintaining the tree is based primarily on a lone Bing Maps photo taken one year and eight months prior to the incident. Mr. Bloch did not review a single page of the Smithsonian's maintenance logs recording the close inspection and treatment of the tree over a 16-year span prior to preparing his report and can therefore not identify with any specificity where the Smithsonian's maintenance allegedly fell short. He did not review any historical data about the tree or any other photos to determine changes to the tree or its condition before the branch failure. Nor can he point to any deficiencies in the Smithsonian's tree maintenance policies, because he did not review those before authoring the report. While the report lists various sources and authorities, Mr. Bloch at no point explains how the Smithsonian failed to follow those authorities because he has no way of knowing whether they did or not. Mr. Bloch's opinion, therefore, is based on nothing more than unsupported speculation. Because it does not meet the federal evidentiary standards for expert testimony, the report and testimony should be excluded.

Aside from Mr. Bloch's report, Plaintiff offers no other evidentiary support for any other standard of care or breach by the Smithsonian. Because the report and testimony must be excluded, Plaintiff's claim therefore fails because she cannot prove that the Smithsonian deviated from the applicable standard of care. Nor can she establish any causal relationship between any breach or

deviation on the Smithsonian's part and the injuries she allegedly sustained when she was struck by the tree branch.  No reasonable factfinder could find a breach of a relevant standard of care based either on Mr. Bloch's report and testimony, or the other undisputed facts in the record. Because Plaintiff fails to establish the existence of a genuine fact dispute on an essential element of her negligence claim, summary judgment for the United States is warranted.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts underlying this action are provided in the sections below and in the United States' Statement of Material Facts Not in Genuine Dispute, which the United States incorporates by reference as though fully set forth herein.

A. The Circumstances of Plaintiff's Injury

On June 19, 2016, Plaintiff Mahtab Arsanjani, 49 years old at the time of incident, was walking on a public sidewalk by the corner of 9th Street NW and Constitution Avenue NW in Washington D.C., near the Smithsonian Institution's National Museum of Natural History, when a tree branch from an American elm tree on the Museum property failed and struck her.  Am. Compl. ¶¶ 9-10, ECF No. 12.  Plaintiff alleges she sustained "serious, severe, and permanent injuries" from the incident.  *Id.* ¶ 11.  Plaintiff further alleges that the Smithsonian "had a duty to inspect and maintain its parks, trees, and the surrounding environs so as to avoid the risk of harm or bodily injury[,]" and that it breached that duty on June 19, 2016.  *Id.* ¶¶ 17-18.  Plaintiff demands $5,000,000 in damages, including fees and costs.  *Id.* ¶ 22.

B. The Smithsonian's Maintenance of the Elm Tree

In the years prior to the incident, the Smithsonian had been testing, monitoring and maintaining the tree in accordance with Smithsonian Gardens policies, which are based on the generally accepted industry standards for tree care practices known as the ANSI A300 standards and on the best management practices developed by the International Society of Arboriculture.

Def.'s Statement of Material Facts ("SOMF") ¶¶ 4-6; Exs. A-D.  The Smithsonian Gardens team includes several horticulturists and a full-time arborist who is responsible for maintaining the health of the trees on Smithsonian grounds.  SOMF ¶ 7; Ex. B.  Smithsonian Gardens maintenance logs going back to 2000 illustrate the efforts taken by the Smithsonian to treat and assess the tree.  SOMF ¶ 10; Exs. F-G.  In 2001, the Smithsonian contracted with an outside expert to perform a resistograph test on the elm, which is an advanced testing technique used to detect internal decay.  SOMF ¶ 11, Exs. F-G.  The test indicated a defect in the tree, but because the majority of the tree was sound, neither tree removal nor any stem removal was recommended.  Ex. G. at 3.  In the years 2004–2010, the Smithsonian visually inspected and assessed the tree, pruned the tree's crown multiple times, removed a limb, injected a pathogen treatment, and installed extra high strength cables.  SOMF ¶¶ 12-15; Ex. F at 1; Ex. G at 3.

In August 2010, the Smithsonian again enlisted the services of an outside expert and hired a registered consulting arborist with tree care company Casey Trees to survey the trees around the Museum and prepare a Tree Management Plan.  SOMF ¶ 16; Ex. B.  The arborist concluded that the elm did not have any open and obvious defects, but presented immediate concerns that required pruning, further inspection by an arborist, and maintenance according to ANSI A300 standards.  SOMF ¶ 16; Ex. B at 28.  The Smithsonian complied with these recommendations in the following years.  SOMF ¶¶ 17-23; Exs. F-G.

In October 2011, Mr. Huse joined Smithsonian Gardens as its new full-time staff arborist.  SOMF ¶ 17; Ex. E at 37.  Mr. Huse is a certified arborist and is qualified in tree risk assessment by the International Society of Arboriculture.  SOMF ¶ 8; Ex. E at 18-19.  Qualification in tree risk assessment requires completing a multi-day course taught by a certified arborist who is also qualified in tree risk assessment, and taking and passing a day-long exam.  Ex. E at 19.  The course

4

involves both classroom instruction and fieldwork during which students must conduct assessments on actual trees. *Id*. The exam also involves a paper exam and field exercises. *Id*.

In his deposition, Mr. Huse testified that he visually inspected the elm tree every time he was in the vicinity and assessed the tree to detect any changes or potential issues. SOMF ¶ 17; Ex. E at 91-92. In addition to these regular inspections, Mr. Huse conducted a complete 360-degree, on-the-ground health and risk assessment of the tree in April 2014 using International Society of Arboriculture standards. SOMF ¶ 21; Ex. G at 4; Ex. E at 43. He inspected the entire tree from its crown to the root system using International Society of Arboriculture tree risk assessment qualification methodology to look for any potential defects and assess its health. *Id*. Following the assessment, Mr. Huse recommended continued monitoring of the tree's condition and proactive maintenance, including pruning, fertilizer treatments and regular Dutch Elm Disease treatments. SOMF ¶ 22; Ex. G at 4. Once again, the Smithsonian followed these recommendations. SOMF 23; Ex. G at 4.

Between 2014 and 2016, the elm was visually inspected and, per Mr. Huse's recommendations, received a range of routine tree care treatments every three to five months. *Id*. It received an elm scale treatment in May 2014, a soil injection of root bio-stimulants in September 2014, a pruning of all dead limbs in November 2014, another elm scale treatment and root bio-stimulant soil injection in April 2015, a Dutch Elm Disease treatment in July 2015, a root bio-stimulant soil injection and maintenance pruning in October 2015, and soil injections of root bio-stimulants in March and June 2016. Ex. G at 4.

C. The Smithsonian's Expert Report

The Smithsonian's expert Mr. Carlson submitted his 27-page report on May 28, 2021. Ex. H. Mr. Carlson has more than 44 years of experience in the field of arboriculture as a commercial

arborist and a consulting arborist.  *Id*. at 3.  He is an International Society of Arboriculture Board Certified Master Arborist, an American Society of Consulting Arborists Registered Consulting Arborist, and has been qualified by the International Society of Arboriculture in Tree Risk Assessment since 2013, with re-qualifications in 2015 and 2019.  *Id*. at 3, 28.  Before writing his report, Mr. Carlson visited the site on September 9, 2020 to inspect the tree and incident location. *Id*. at 2.  During his site visit, Mr. Carlson took measurements of the tree using a Nikon Forestry Pro laser hypsometer, an instrument used to measure height, and observed numerous support cables throughout the crown.  *Id*. at 4.  He observed that the "exposed wood on the limb cut . . . showed very little decay," and that the "wood, as examined from the ground, appeared that it had been mostly solid at the time of failure."  *Id*. at 5.

Mr. Carlson also reviewed numerous photographs of the tree.  In addition to viewing several photos from the day of the incident, he pulled and reviewed "archived street-level imagery from Google Street View and Microsoft Bing Streetside, and aerial imagery from Google Earth and Pictometry International."  *Id*.  Because he viewed a collection of images taken over the years, he could discern "the condition of the tree and the limb over a recent span of years."  *Id*.

In addition to the multiple photographs that Mr. Carlson relied on, he also reviewed the deposition transcripts of Plaintiff, former Smithsonian arborist Mr. Huse, current Smithsonian arborist Jacob Hendee, Smithsonian horticulturist James Gagliardi, Smithsonian Gardens Deputy Director Jeff Schneider, and District of Columbia urban forester R. Duff McCully.  *Id*. at 19.  Mr. Carlson also reviewed hundreds of pages of documents, including the Smithsonian's tree maintenance records from December 2000 to June 2016, Mr. Huse's After Action Report, and Mr. Bloch's report.  *Id*. at 7, 19.  From his review of these documents, he concluded that "the tree was under careful watch" and had "been assessed and inspected many times between December 2000

6

and June 2016." *Id*. at 7, 11.  He noted that the maintenance records included "physical treatments made to the tree as well as higher level inspections of the tree." *Id*. at 7.  Mr. Carlson also observed that the Smithsonian "has a detailed program for the maintenance of trees and other plants in the gardens, including routine inspections of trees for safety issues." *Id*.

> Based on all of these facts and data, Mr. Carlson concluded:

> It is my professional opinion that the arborists and staff of the Smithsonian Institution acted properly in their assessment and care of the American elm in front of the National Museum of Natural History.  They followed a protocol of assessment and inspection, monitored the tree on a regular basis, and based their decisions on current industry guidance and published standards for care and assessment of trees.

*Id*. at 12.

D.   Plaintiff's Proposed Expert Report

Plaintiffs also proffer an expert report by Mr. Bloch, completed on June 24, 2020.  Ex. I. In contrast to Mr. Carlson and Mr. Huse, Mr. Bloch has not renewed his International Society of Arboriculture tree risk assessment qualification, and that qualification was therefore not current at the time of his report.  *Id*. at 9.  Also, in contrast to Mr. Carlson, Mr. Bloch prepared his report without reviewing any of the Smithsonian's maintenance records, data logs about the elm, tree maintenance policies, or the detailed After Action Report authored by Mr. Huse after the event. *Id*.  His report cites various tree maintenance literature without applying those citations to the Smithsonian's maintenance policies or its specific maintenance of the elm.  *Id*.  In his deposition, Mr. Bloch testified that, during his sole site visit to the tree four years after the incident, he took no measurements.  Ex. J at 30-31.  He also insisted that he could offer his expert opinion on the cause of the branch failure based on a single photo taken of the tree 20 months before the incident. *Id*. at 34, 45.  Mr. Bloch could not identify any national risk assessment standard supporting his contention that a single photo is sufficient to make such a conclusive statement.  *Id*. at 74-75.

Indeed, throughout his deposition, Mr. Bloch could not identify any standards of care on which to base his opinions. He concluded that the tree limb was too long with excessive weight but could not name any standard for how long or heavy a limb should be. *Id.* at 51 ("I don't know how to answer. There's – I've never heard of any protocol about how long a limb should be or how much it should weigh if that's the question"). He opined that the tree should have been pruned, but when asked about the standard of care for tree pruning, stated, "[t]here is no standard." *Id.* at 56. Mr. Bloch also asserted that the tree should have been inspected, but when pressed about standards for the frequency of inspections, he stated, "I never said any inspection was required. None of these are requirements." *Id.* at 73. He then admitted that the bases for his opinions are not standards, declaring "[t]hese are guidelines. These are not – they're not requirements and they're not standards. They're guidelines." *Id.* Despite the requirement that experts provide an articulable standard of care to assist the trier of fact, Mr. Bloch testified repeatedly in his deposition that he either could not identify a standard or that it simply did not exist.

## **LEGAL STANDARDS**

### A. Summary Judgment

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiff, in response to Defendant's motion, must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

8

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted).

Although a court should draw all reasonable inferences from the supporting records in support of the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier of fact could find for the nonmovant. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). The adverse party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e); emphasis in original).

B. Liability Under the Federal Tort Claims Act

Plaintiff asserts a claim of negligence against the United States under the FTCA. "It is elementary that the United States, as a sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain that suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (citation omitted). Moreover, "a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Id.* (citing *United States v. King*, 395 U.S. 1, 4 (1969)). "The FTCA represents a limited waiver of the government's sovereign immunity," which grants this Court "jurisdiction over a certain

9

category of claims for which the United States has rendered itself liable," and provides the exclusive remedy for common law tort claims against the United States. *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003) (citing *United States v. Orleans*, 425 U.S. 807, 813 (1976)); *see also FDIC v. Meyer*, 510 U.S. 471, 476-77 (1994)).

> Section 1346(b) of the FTCA provides that the federal district courts
>
> shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); *see also Tri-State Hosp. Supply Corp.*, 341 F.3d at 575; *Cope v. Scott*, 45 F.3d 445, 447 (D.C. Cir. 1995).

C. Negligence Under the District of Columbia Law

In considering Plaintiff's negligence claim, the Court applies the law of the District of Columbia. *See* 28 U.S.C. § 1346(b)(1). Under District of Columbia law, "[i]n an action for negligence, the plaintiff has the burden of proving by a preponderance of the evidence the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury." *Varner v. District of Columbia*, 891 A.2d 260, 265 (D.C. 2006) (citation omitted). "[T]here is only one standard of care for persons lawfully upon [a] landowner's or land occupier's property, and this is reasonable care under the circumstances." *Sandoe v. Lefta Assocs.*, 559 A.2d 732, 742 (D.C. 1988); *see also id.* at 738 ("this jurisdiction does not recognize varying standards of care depending upon the relationship of the parties but always requires reasonable care to be exercised under all the circumstances") (quoting *Blumenthal v. Cairo Hotel Corp.*, 256 A.2d 400, 402 (D.C. 1969)).

Pursuant to the District of Columbia's "expert testimony requirement," "a plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (quoting *District of Columbia v. Hampton*, 666 A.2d 30, 35-36 (D.C. 1995) and *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000)).  District courts require expert testimony in a "wide variety of situations." *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 200 (D.C. 1991).  And in the District of Columbia, allegations of negligent tree maintenance require expert testimony.  *See Briggs*, 481 F.3d at 845 (citing *Katkish v. District of Columbia*, 763 A.3d 703, 706 (D.C. 2000)).

### D. Admissibility of Expert Testimony

Before expert testimony may be admitted at trial, Federal Rule of Evidence 702 and *Daubert* require a Court to serve as a "gatekeep[er]" by "engag[ing] in a preliminary assessment of the scientific validity of the expert's reasoning or methodology." *Ambrosini v. Labarraque*, 101 F.3d 129, 138 n.11 (D.C. Cir. 1996) (citing *Daubert v. Merrell Dow Pharm.*, *Inc.*, 509 U.S. 579, 592-93 (1993)).  Specifically, the expert may only testify if he or she is qualified and:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In establishing the reliability of the expert's conclusions, the party proffering the expert need not prove that the expert's opinions are correct, but only that a qualified person has reached the opinions in a sound and methodologically reasonable manner. *Carmichael v. West*, Civ. A. No. 12-1969 (BAH), 2015 WL 10568893, at *6 (D.D.C. Aug. 31, 2015).  Thus, the Court "must

focus solely on principles and methodology, not on the conclusions that they generate." *Ambrosini*, 101 F.3d at 133 (quoting *Daubert*, 509 U.S. at 595).

Also, while the contents and quality of expert reports may be the subject of *Daubert* motions—which are motions *in limine* by nature—the Court nonetheless may consider the competence of a plaintiff's expert report in a motion for summary judgment. *See Carmichael*, 2015 WL 10568893, at *6. In other words, where the plaintiff's proffered expert could not carry the plaintiff's burden of proof at trial, the Court may grant summary judgment, dismissing plaintiff's case as a matter of law.

## ARGUMENT

**I.    PLAINTIFF'S EXPERT REPORT AND TESIMONY SHOULD BE EXCLUDED BECAUSE BOTH FAIL TO MEET THE STANDARD SET FORTH IN FED. R. EVID. 702.**

Because tree maintenance is beyond the ken of the average layperson, expert testimony is required to establish the standard of care and any deviation from that standard. *See Katkish*, 763 A.2d at 706. Plaintiff attempts to establish these elements through the report and testimony of her expert witness, Mr. Bloch. Ex. I; Ex. J. His testimony must be able to assist the trier of fact in determining whether the Smithsonian exercised reasonable care in maintaining the elm tree.

For Mr. Bloch's testimony to be admissible, he must be qualified by knowledge, skill, experience, training, or education; his knowledge must assist the trier of fact to understand the evidence or determine a fact in issue; his testimony must be based on sufficient facts or data; his testimony must be the product of reliable principles and methods; and he must reliably apply those principles and methods to the facts of the case. Fed. R. Evid 702. A review of Mr. Bloch's report and deposition testimony demonstrate that his opinions do not satisfy these requirements. They are not based on sufficient facts or data and are not premised on reliable principles or methodology. Nor does Mr. Bloch reliably apply principles and methods to the facts of the case. Thus, Mr.

Bloch's testimony will not help the trier of fact understand the evidence or determine a fact in issue.  It should be excluded.

A.  Bloch's Report Is Not Based on Sufficient Facts or Data to Form a Reliable Opinion

Mr. Bloch's report, "Preliminary Tree Report," dated June 24, 2020, is a written report of about three pages and includes 6 photos.  Ex. I.  Mr. Bloch purports to offer an opinion that the tree limb that failed and injured Plaintiff "occurred because of very poor tree structure in the canopy of the tree.  The limb was far too long with excessive end weight and poor taper causing the failure."  *Id*. at 2.  The report further opines that "[a] proper tree risk assessment should have diagnosed this situation and had this tree risk that had been apparent for many years abated per the following national protocols."  *Id*.  In reaching this conclusion, Mr. Bloch relied on the following items: (1) photos of the tree and the tree limb clean-up; (2) the Office of Protection Services incident report with photos; (3) Plaintiff's answers to Defendant's interrogatories; (4) Plaintiff's response to Defendant's request for production of documents; and (5) media articles and videos of the event.  *Id*.  None of these documents provided any information about the elm before the branch failure, including the Smithsonian's maintenance of the tree.  The Office of Protection Services incident report was written by a security guard who responded to the scene and contained basic facts about the time of the incident, the injured parties, and the steps taken to contain the site after the incident and does not offer details about the tree's condition.  Ex. K.  And, at his deposition, Mr. Bloch stated that the media articles or videos did not assist him in writing his report.  Ex. J at 29.

Notably, before writing his report, Mr. Bloch did not review any Smithsonian Gardens policies or protocol, maintenance records for the elm, historical data about the elm, or Mr. Huse's After Action Report.  Ex. I; *see* Ex. J at 26-27, 60 (confirming Mr. Bloch had not reviewed any

Smithsonian maintenance documents before preparing the expert report).  Mr. Bloch did not review any deposition transcripts, including the testimonies of Mr. Huse, Smithsonian Gardens Deputy Director Jeff Schneider, or other Smithsonian Gardens employees.  Ex. I.  In addition to neglecting to review these records before authoring his report, Mr. Bloch also declined to review any weather reports from the day of the incident, yet still opined that weather did not cause the limb to fail.  Ex. J at 34-35, 55.  In contrast, before preparing his report, Smithsonian expert Mr. Carlson researched the meteorological conditions in the weeks leading up to the limb failure, as well as on the date of the incident, June 19, 2016.  Ex. H at 7-8.

Rather, Mr. Bloch's limited knowledge of the tree is based on a single site visit on June 16, 2020, four years after the incident, and one photo of the tree from October 2014 pulled from Bing Maps.  Ex. I.  Regarding the visit, Mr. Bloch testified that he spent approximately one hour at the site, during which time he "looked at the tree" and "[t]ook some pictures" of the tree.  Ex. J at 31. However, he did not conduct a risk assessment or take any measurements of the tree.  *Id*. at 31, 34. This was the only time Mr. Bloch ever visited the site.  He had not inspected the tree at any time prior to June 16, 2020, and, unlike Mr. Huse, he did not have the opportunity to inspect the tree or limb immediately after the incident.  *Id*. at 31.  Thus, Mr. Bloch was not aware of the weight or length of the tree limb that failed.  *Id*. at 49-50.  Indeed, not only did he fail to review any records that would provide him with more details about the tree or limb, Mr. Bloch stated during his deposition that he had "no desire to know" those details, and "[n]one of those statistics mattered" to him.  *Id*. at 74.

To inform his opinion on the state of the tree prior to the branch failure, Mr. Bloch did not read any of the maintenance logs, Smithsonian records, or contractor reports about the elm. Instead, he relied on one online photo from October 2014.  Ex. I at 2,6; Ex. J at 34, 45, 73.  This

picture showed the tree only from one side, and Mr. Bloch did not review any other angles of the tree or limb.  Unlike Mr. Carlson, he did not pull photos of the tree from before October 2014 or between that date and the June 2016 incident to analyze any differences.  He testified that he simply looked at one photograph—taken one year and eight months prior to the incident—and formed his opinion about the tree limb failure based on that single source.  Ex. J at 34, 45, 73.  Because he did not look at any pictures from the intervening 20 months before the incident, did not review the Smithsonian's maintenance records which recorded, among other treatments, tree pruning in November 2014 and October 2015, and was not aware of the measurements of the limb at the time of failure, Mr. Bloch had no way of ascertaining the state of the limb on June 19, 2016 and whether the Smithsonian had taken reasonable measures to maintain it.

When asked in his deposition about whether there is a national standard that a review of a single photograph is sufficient to conduct a risk assessment, Mr. Bloch stated, "you do them the best way you can" and "[w]hatever information is given to me, that's what I'll make my assessment on."  *Id*. at 74-5.  When again pressed if there is a "minimum amount of information" required to form "a reliable assessment," Mr. Bloch protested "I don't know how to answer.  I don't understand the question.  Minimum amount of information?  I don't know how to answer that question.  I'm trying to testify that I make my decision on the information that's given to me."  *Id*. at 75.  But, Mr. Bloch did not make a decision based on all the available information.  He did not review the most relevant documents that contained actual data about the tree, yet still asks the parties and this Court to accept his opinion notwithstanding this substantial deficiency.

Federal evidentiary rules and *Daubert*, however, dictate that such limited reliance on actual facts or data render Mr. Bloch's testimony inadmissible.  *See, e.g., Campbell v. Nat'l R.R. Passenger Corp*., 311 F. Supp. 3d 281 (D.D.C. 2018).  In *Campbell*, the plaintiffs retained an

expert to review defendant's hiring, promotional and disciplinary policies and render an opinion on whether they were consistent with generally accepted human resources ("HR") practices. *Id*. at 298. In preparing his report, the expert relied on plaintiffs' complaint, defendant's answer, and some discovery and deposition transcripts. *Id*. The Court noted that the expert's opinions were supported "only by 'cherry-picked' documents selected by plaintiffs' counsel" and that he failed to review "a host of other evidence 'pertinent to the question he purportedly sought to answer[.]'" *Id*. at 298-99. While an expert "need not consider every possible factor to render a 'reliable' opinion, the expert still must consider *enough* factors to make his or her opinion sufficiently reliable in the eyes of the court." *Id*. at 299 (citation omitted). Therefore, the Court concluded that the report relied on insufficient facts and data because it purported to opine about HR management practices but failed to review information critical to those opinions, including the depositions of any HR managers and documents related to HR practices. *Id*. Likewise here, Mr. Bloch purports to opine on whether the Smithsonian exercised reasonable care in maintaining the elm but failed to review the deposition of the arborist responsible for that maintenance and tree care or any risk assessment documents for the elm. Moreover, he asserts an opinion on the cause of the branch failure, yet he failed to review data about the branch or anything more than a single photo of the tree. Mr. Bloch's report is plainly not reliable and must be excluded.

B. <u>Bloch's Report Does Not Cite to Any Standards Upon Which the Court May Rely</u>

An expert's testimony may not consist merely of an opinion of what he would have done under similar circumstances. *See Briggs*, 481 F.3d at 846. Nor can an expert simply declare that a defendant violated the national standard of care or a general duty of care. *Id*.; *see also Varner*, 891 A.2d at 273. "Rather, the expert must clearly articulate and reference a standard of care by

which the defendant's actions can be measured." *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997) (citation omitted). Mr. Bloch's testimony does not satisfy this requirement.

Mr. Bloch's deposition testimony contains numerous examples of his inability to identify standards against which the Smithsonian's actions can be measured. His expert report concluded that the "limb was far too long with excessive end weight," but he testified during his deposition that he had not taken any measurements of the limb and was unaware of any standard for the length or weight of a limb. *See* Ex. I; Ex J at 49-51 ("Q: Is there any protocol pertaining to how long or how much a limb should weigh with the particular tree at issue? [. . .] A: I don't know how to answer. There's – I've never heard of any protocol about how long a limb should be or how much it should weigh if that's the question").

Mr. Carlson's expert report addresses the unreliability of this opinion, noting that Mr. Bloch did not closely examine the available evidence and "did not describe or define what constitutes excessive end weight or poor taper, or how he determined that these conditions were indeed present." Ex. H at 8. Mr. Carlson's report also provides precisely what Mr. Bloch testified he could not—an actual, measurable standard for his opinion—and concludes that, according to this standard, the limb's taper was within the acceptable range:

> Mr. Bloch claimed that the failed limb exhibited excessive end weight and poor taper, without providing any support for those conclusions other than his own observation and interpretation. I made estimates of the taper, or slenderness as it is called within the arboriculture and forestry professions. Starting with a limb length of 75 feet (measured on several orthographic aerial images) and an estimated limb diameter of 24 inches at the base of the limb, the Height/Diameter ratio (Mattheck 2015) of the limb is 37.5. A ratio of 50 is considered as the typical acceptable threshold for slenderness in trees, and a ratio of less than or equal to 50 is within the acceptable range. Although this ratio is based on the stems of vertical tree trunks, it is the only guidance currently available for the consideration of taper. It indicates that the taper of this failed limb is far below the suggested taper threshold for trees.

*Id*. at 9-11 (internal citations omitted).  Mr. Bloch, in contrast, asserted during his deposition that there is "a lot of literature" describing limbs like the failed branch, but did not cite the actual literature, explain what that literature states, or apply the literature to the limb.  *Id*. at 45.

Mr. Bloch's report also concluded that the "solution to this tree risk problem would have been to prune as mentioned above.  This is referred to crown reduction pruning." Ex. I at 4.  Yet, when asked at deposition how often a tree should be pruned, Mr. Bloch stated, "There is no standard."  *Id*. at 56.  Mr. Bloch's report opined that trees such as the elm "should be inspected on a regular basis." Ex. I at 4.  However, during his deposition, when asked at what point a tree may need annual inspections, Mr. Bloch responded, "I can't answer that question" and that he did not believe he'd ever seen any literature that states such a requirement.  *Id*. at 72.

In fact, during his deposition, Mr. Bloch declared that his opinion is not based on standards. With respect to tree inspections, he stated, "I never said any inspection was required.  None of these are requirements."  *Id*. at 73.  When counsel asked a clarifying question of whether the standard of care dictates that a tree should be inspected every year, Mr. Bloch answered, "No, sir. These are guidelines.  These are not – they're not requirements and they're not standards.  They're guidelines."  *Id*. at 73.  And in response to counsel's question about how a property owner is supposed to know whether a tree needs to be inspected, Mr. Bloch replied that they should consult an arborist.  *Id.* at 72.  Which, of course, is precisely what the Smithsonian did.

To be sure, Mr. Bloch's report does contain citations to, as he describes, "national documentation and standards" as support for various statements.  Ex. I.  He states, for instance, that "[i]t is important for a property owner/manager to have trees that may pose a risk to cause damage inspected by a professional in order to keep the area around the trees safe," and then cites to four titles as support.  Ex. I at 2.  However, these citations are for general arboricultural practices

with no application to, or analysis of, the Smithsonian's practices or the actual elm here at issue. When Mr. Bloch was pressed at his deposition about how he utilized these resources in his report, he could not answer. Ex. J at 42-43 ("Q: And with these – let me just make – so with these four national documentation, how do they assist you with your report?  A: Well, I don't – it just dealt with the trees should be inspected").  Later, counsel asked Bloch whether, based on the articles, trees should be inspected once every year, and Mr. Bloch replied, "I think it would be a good idea," reflecting Mr. Bloch's personal opinion rather than an actual articulated standard.  *Id.* at 44.

Courts repeatedly have deemed expert testimony such as Mr. Bloch's inadmissible.  *Briggs*, 481 F.3d at 846-47 ("The D.C. Court of Appeals has found 'generalized references' to standards insufficient.  The expert must proffer 'a specific, articulable (and articulated) standard of care" (internal citations omitted)); *Varner*, 891 A.2d at 269 (articulation of a specific standard is essential "[e]specially in circumstances in which . . . the defendant is alleged to have failed to protect the plaintiff from harm"); *Pannell v. District of Columbia*, 829 A.2d 474, 479-80 (D.C. 2003) (excluding expert testimony when expert testified he had no opinion on a "national standard of care" and "could only state generalized duties (*e.g.*, 'the ultimate duty is to protect' . . .) and offer his own conclusory opinion that the standard of care was violated"); *Philips v. District of Columbia*, 714 A.2d 768, 773 (D.C. 1998) ("[W]e have since made it clear that the expert must testify to the *specific* . . . standards, and must relate them directly to the defendant's conduct" (internal citations omitted).

Mr. Bloch testified in his deposition that there are no standards and no requirements, only guidelines.  By his own statements, his testimony is therefore inadmissible.

C.  Bloch's Report Does Not Apply Reliable Methodology to the Facts of the Case

The Smithsonian and Mr. Bloch both agree that there is no such thing as a "safe tree." Smithsonian Gardens policy states this explicitly: "However, there is no such thing as a 'safe tree.'" Ex. B at 13. Mr. Bloch echoed this reality in virtually the same language during his deposition: "there's no such thing as a safe tree that won't possibly topple or break limbs. There's no such thing as a safe tree." Ex. J at 76. Therefore, tree maintenance practices do not exist to eliminate all risk from trees; instead, they adopt a methodology to assess and reduce risk to an acceptable level. And that is the proffered purpose of Mr. Bloch's testimony: to assist the trier of fact in determining whether the Smithsonian met its duty of care in this regard. However, Mr. Bloch's testimony cannot aid in this manner because he did not review the Smithsonian's maintenance of the tree, and his opinion that the Smithsonian did not effectively maintain it is not grounded in reliable data or principles. He argues that trees should be assessed for risk, but he does not—and cannot—say that the Smithsonian did not assess the tree for risk. He conducted a "risk assessment of the photograph of the tree before the incident," but as stated above, he had no knowledge of any changes to the tree or maintenance conducted by the Smithsonian between the date of the photo and the time of the incident 20 months later. Ex. J at 34.

Mr. Bloch acknowledged in his deposition that cabling could help alleviate any risk from the tree limb, but because he had not reviewed Smithsonian records prior to his report, he was unable to articulate whether the Smithsonian engaged in such a remediation effort and whether, or how, it was effective. *Id*. at 46-47. He stated that the Smithsonian did not make any crown reductions, basing this assertion on the single Bing Maps photo, but he did not view any comparative pictures from before or after 2014. *Id*. at 47. Mr. Bloch could not answer how often the Smithsonian had inspected the tree or what types of inspections were conducted. *Id*. at 77-78.

20

In short, Mr. Bloch cannot opine that the Smithsonian did not conduct a proper diagnosis when he did not even review the tree's maintenance records to ascertain the tests that had been undertaken. For these reasons as well, Mr. Bloch's report and testimony should be excluded.

> D. By Contrast, Bloch's Report in *Walen v. United States* Was Based on an Actual Review of Government Maintenance Policies and Work Reports

Plaintiff will undoubtedly cite to the decision in *Walen v. United States* as essentially dispositive of the issue of the admissibility of her expert's testimony. Civ. A. No. 15-1718, 2019 WL 4261160 (D.D.C. Sep. 9, 2019). In that case, Mr. Bloch submitted an expert report on behalf of a plaintiff injured by a tree branch while crossing the Connecticut Avenue Bridge in Washington D.C. during Superstorm Sandy. *Id*. at *1. Mr. Bloch likewise submitted a short, conclusory report in that case, and the United States moved to exclude the report and for summary judgment. *Id*. at *5. The Court denied the motion, finding that Mr. Bloch's report satisfied the requirements of Fed. R. Evid. 702 because the "standard of care articulated there is neither overly general nor dependent on totally baseless assertions." *Id*. at *9. However, there are key differences between Mr. Bloch's report and testimony in *Walen* and the present case.

Significantly, in *Walen*, in addition to photographs of the limb following the incident, Mr. Bloch also reviewed National Park Service ("NPS") documents related to tree management and work reports, and a letter from the Superintendent of Rock Creek Park to a member of the area Advisory Neighborhood Commission regarding the incident. *Id*.; *see also Walen* Expert Rep. (Ex. L). The report noted that NPS policies required regular inspections to protect the public from the risks associated with hazardous trees and provided details about the level of inspections, including monthly drive-by inspections and bi-annual walk-through inspections by trained tree care professionals. 2019 WL 4261160 at *9.; Ex. L at 2. The letter from the Superintendent contained conclusions about the cause of the limb failure and a discussion of NPS tree inspections. Ex. L at

2. The report therefore concluded that the limb that failed had been dead for several years prior to the incident and should have been discovered had the "required tree inspections [] been performed properly." *Id*. at 3.

Thus, the opinion in *Walen* is based on actual review of NPS work reports and NPS policy and an application of that policy to the facts of the incident. *Id*. at 2-3. Indeed, the *Walen* Court found that "the specifics in Mr. Bloch's report describing the frequency and nature of inspections required by NPS and the appearance and size of the limb indicate that Mr. Bloch may, at trial, provide a non-expert trier of fact with a concrete, specific standard of care regarding tree inspections and what such inspections should have identified." 2019 WL 4261160 at *9. The *Walen* report, therefore, was based on sufficient data and facts, unlike the present report, which essentially presents an opinion based on a single photograph and no review of Smithsonian tree maintenance policies or its maintenance of the actual tree in question.

Further, Mr. Bloch was not deposed in *Walen*. Here, he was given the opportunity at deposition to bolster the reliability of his report, and, as described above, he did not. Indeed, he testified several times during his deposition that he was not aware of any relevant protocol, there were no applicable standards, and, in fact, his opinion was not based on "requirements" or "standards," but only "guidelines." Ex. J at 51, 56, 73. Thus, the facts here are very different than in *Walen*, and in this case Mr. Bloch's report is inadmissible.

Mr. Bloch does not address the overall risk management strategy that the Smithsonian undertook. He focused only on what he believes made the tree fail, rather than on whether the Smithsonian had an adequate risk assessment plan. But that is the very focus of this case: whether the Smithsonian exercised reasonable care. Expert opinion can—and will—vary on the ultimate cause of the tree failure. The purpose of the expert testimony in this case is whether the

Smithsonian exercised reasonable care in maintaining the tree. Mr. Bloch's sparse, inadequately supported report cannot aid the trier of fact in determining this issue. While the Court need not be convinced that Plaintiff's expert's conclusions are incorrect, those conclusions must have been reached in a sound and methodologically reliable manner. On its face and based on Mr. Bloch's own admissions, Plaintiff's expert report fails to meet this standard. As a result, the Court should exclude all testimony by Mr. Bloch.

## II. PLAINTIFF CANNOT ESTABLISH THAT THE SMITHSONIAN BREACHED THE STANDARD OF CARE, AND HER CLAIM FAILS AS A MATTER OF LAW.

Where a plaintiff fails to present competent expert testimony in a case requiring it, the Court "must enter judgment for the defendant." *Beard*, 587 A.2d at 200 (citation omitted). The Court may consider the competence of a plaintiff's expert report in a motion for summary judgment. *See Carmichael v. West*, Civil Action No. 12-1969 (BAH), 2015 WL 10568893, at *6 (D.D.C. Aug. 31, 2015). Here, Mr. Bloch's report focuses only on what allegedly caused the tree limb failure and contains no review or assessment of whether the Smithsonian took reasonable precautions in preventing that failure and, without consulting Smithsonian records, he could not reach such a decision. Mr. Bloch's report is not based on sufficient facts or data, he failed during his deposition to articulate a specific standard of care that the Smithsonian breached, and his report ultimately is based on his own personal opinion of the measures he would have taken regarding the elm tree. *See, e.g., Travers v. D.C.*, 672 A.2d 566, 568 (D.C. 1996) ("The personal opinion of the testifying expert as to what he or she would do in a particular case, without reference to a standard of care, is insufficient to prove the applicable standard of care.").

The fact of the failure—and the resultant injury—is not enough to establish negligence. Plaintiff must prove that the Smithsonian deviated from the standard of care, and that this deviation proximately caused the injury. Mr. Bloch's report and deposition testimony do not even attempt

to address the Smithsonian's documented record of maintaining and assessing the tree and are therefore insufficient to establish either of those elements.  For these reasons, Mr. Bloch's testimony should be excluded, and Plaintiff therefore cannot establish an essential element of her claim, nor does Plaintiff have any evidence disputing the Smithsonian's exercise of care.

Accordingly, the Court should enter summary judgment in the United States' favor.

### III.  THE SMITHSONIAN'S MAINTENANCE RECORDS AND EXPERT REPORT ESTABLISH ITS EXERCISE OF REASONABLE CARE, WHICH PLAINTIFF CANNOT REBUT.

Regardless, even if the Court were to determine that Mr. Bloch's report and testimony should not be excluded, Plaintiff's claim still fails due to her expert's failure to review and opine on the Smithsonian's care and maintenance of the elm tree.  Thus, with or without the report, Plaintiff cannot establish that the Smithsonian breached its duty of care, and her claim still fails as a matter of law.  To prevail on her negligence claim, Plaintiff must establish by a preponderance of the evidence the standard of care for tree maintenance, and that the Smithsonian deviated from that standard in maintaining the elm tree, thereby causing her injury.  Here, Plaintiff has no evidence disputing the Smithsonian's documented care and maintenance of the tree.

Smithsonian records establish that it had been testing, inspecting, monitoring, and maintaining the elm tree according to ANSI A300 standards and International Society of Arboriculture best management practices for several years before the incident.  SOMF ¶¶ 4-6; Exs. B, F, G.  The Smithsonian engaged an outside tree expert to conduct an advanced resistograph test on the elm in 2001, and the expert did not recommend either tree removal or stem removal following the testing.  SOMF ¶ 11, Exs. F-G.  From 2004–2010, the Smithsonian continued to visually inspect and assess the tree, conducted routine pruning maintenance, removed a limb, treated for pathogens, and installed extra high strength cables.  SOMF ¶¶ 12-15; Ex. F at 1; Ex. G at 3.  In August 2010, the Smithsonian hired a registered consulting arborist to survey the trees

around the Museum, including the elm.  SOMF ¶ 16; Ex. B.  Following the assessment, the arborist recommended pruning, further inspection by a certified arborist, and maintenance according to ANSI A300 standards.   SOMF ¶ 16; Ex. B at 28.   The Smithsonian complied with these recommendations in the following years.  SOMF ¶¶ 17-23; Exs. F-G.

During his 2011-2016 tenure at the Smithsonian, Mr. Huse, a certified arborist who was also qualified in tree risk assessment, visually inspected the tree every time he was in the area to detect any changes or potential issues and, during pruning maintenance, instructed the pruning crew to inspect all the cables in the tree's crown for potential problems.  Ex. E at 63, 91-92.  In addition to these regular inspections, Mr. Huse conducted a comprehensive health and risk assessment of the tree in April 2014 using International Society of Arboriculture standards.  SOMF ¶ 21; Ex. G at 4; Ex. E at 43.  Following this assessment, he recommended continued monitoring of the tree's condition and proactive maintenance, including pruning, fertilizer treatments and regular Dutch Elm Disease treatments, which the Smithsonian followed.  SOMF ¶¶ 22-23; Ex. G at 4.  Between 2014 and 2016, the elm was visually inspected and received a range of routine tree care treatments every three to five months.  *Id.*

After reviewing Smithsonian Gardens tree care policies, voluminous maintenance records for the tree, and deposition testimony, Smithsonian expert Mr. Carlson concluded that the Smithsonian had acted "properly in [its] assessment and care of the [tree]."  Ex. H at 12.  He concluded that the Smithsonian "followed a protocol of assessment and inspection, monitored the tree on a regular basis, and based [its] decisions on current industry guidance and published standards for care and assessment of trees."  *Id.*

There is no evidence in the record to dispute this conclusion.  Plaintiff cannot rely on her expert Mr. Bloch to rebut the ample evidence of the Smithsonian's reasonable care because Mr.

Bloch did not review any Smithsonian policies, maintenance records, deposition testimony, or any other documents pertaining to the Smithsonian's care of the tree before preparing his report.  Ex. I.  at 2; Ex. J at 26-27, 60.  Plaintiff has no other evidence that the Smithsonian breached its standard of care.  Because Plaintiff has failed to dispute any of the Smithsonian's documented care of the tree, she cannot prove that the Smithsonian breached its duty of care, and her claim must fail as a matter of law.  *See* Fed. R. Civ. P. 56.

## **CONCLUSION**

Accordingly, the United States respectfully requests that the Court exclude Plaintiff's expert report and grant the motion for summary judgment, dismissing Plaintiff's Complaint with prejudice against the United States of America.

Dated:  November 21, 2022

Respectfully submitted,

MATTHEW M. GRAVES
D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

  */s/ Stephanie R. Johnson*
STEPHANIE R. JOHNSON
D.C. Bar No. 1632338
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7874
Stephanie.Johnson5@usdoj.gov

*Attorneys for United States of America*

Of Counsel:

MIA HAESSLY
Assistant General Counsel
Smithsonian Institution

26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAHTAB ARSANJANI,

       *Plaintiff*,

    v.                                  Civ. A. No. 19-01746 (JEB)

UNITED STATES OF AMERICA, *et al.*

       *Defendants*.

## [PROPOSED] ORDER

Upon consideration of the Defendant United States of America's Motion for Summary Judgement and the entire record in this matter, it is hereby:

**ORDERED** that Defendant United States of America's Motion for Summary Judgment is **GRANTED** in its entirety; and it is further

**ORDERED** that the instant case is **DISMISSED** in its entirety against the United States of America.

**SO ORDERED**.

***This is a final, appealable Order.***

Dated this ___ day of ____, 2023.

_____

JAMES E. BOASBERG
United States District Judge