## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAHTAB ARSANJANI,

     Plaintiff,

        v.

UNITED STATES OF AMERICA, *et al.*,

     Defendants.

Civil Action No. 19-1746 (JEB)

## <u>MEMORANDUM OPINION</u>

A large American elm tree sits at the corner of 9th St. and Constitution Ave., NW, on the grounds of the Smithsonian's National Museum of Natural History. This Opinion, unfortunately, offers no paean to the majesty or splendor of this old timber. Instead, one of its branches is the villain here, as it fell and struck Plaintiff Mahtab Arsanjani in 2016 as she was walking on the adjacent sidewalk.

Seeking redress for the harm she suffered as a result, Arsanjani brought this suit against Defendants United States and District of Columbia, alleging that their negligent maintenance of the tree caused her injuries. In accordance with D.C. law, both sides retained expert witnesses to opine about the standard of care owed by Defendants to Plaintiff and other pedestrians. Defendants have each now moved for summary judgment.

The United States principally argues that Plaintiff's expert's testimony should be excluded under Federal Rule of Evidence 702, while the District of Columbia (joined by the United States) maintains that, even if admissible, the testimony failed to establish the existence of an applicable standard of care. Because the viability of Plaintiff's claims depends on her

presentation of sufficient expert testimony, Defendants' success on either one of those contentions requires judgment in their favor.  As the Court agrees with Defendants on both, it will grant the Motions.

## I.      Background

Because Plaintiff did not file a Statement of Material Facts laying out the background of this case and because she does not dispute Defendants' characterization of that context, the following section pulls primarily from the United States' Statement of Material Facts.  See ECF No. 47-2 (Pl. SOF), ¶ 1 (providing no factual background and contending only that a "genuine issue of material fact exi[s]ts as to whether the Defendant breach[ed] the standard of care").  Where necessary, the Court looks to the Amended Complaint to supplement those facts.

At approximately 3:00 p.m. on June 19, 2016, Arsanjani was walking on the sidewalk at the intersection of 9th St. and Constitution Ave. when a branch of the elm tree fell and struck her.  See ECF No. 43-1 (U.S. SOMF), ¶¶ 24, 26; ECF No. 12 (Am. Compl.), ¶ 9.  She alleges that she "was pinned to the sidewalk and sustained serious, severe, and permanent injuries." Am. Compl., ¶ 11.  The morning after the incident, the Smithsonian's full-time arborist at the time, Gregory Huse, reported to the site to evaluate the tree and fallen limb.  See U.S. SOMF, ¶¶ 8, 29.  He prepared an After Action Report "summarizing the incident, historical maintenance of the tree, and lessons learned from the event."  Id., ¶ 29.  The Report listed "at least 27 events when the tree was inspected, tested, or otherwise treated" in the years preceding the accident. Id., ¶ 30.

Plaintiff filed this action on June 14, 2019.  See ECF No. 1 (Compl.).  The operative Complaint names as Defendants the United States and the District of Columbia and contains two counts.  See Am. Compl., ¶¶ 2, 16–22; 23–29.  They respectively allege that each Defendant was

negligent in its inspection and maintenance of the elm tree, and that such negligence caused Arsanjani's injuries.  Id., ¶¶ 16–22 (Count I against USA); ECF No. 47 (Opp. to U.S. MSJ) at 1 (describing Count I as claim under Federal Tort Claims Act); Am. Compl., ¶¶ 23–29 (Count II against D.C.).  Plaintiff seeks $5 million in damages.  See Am. Compl. at 6, 8.

The parties proceeded to discovery.  In that process, and as most relevant here, both Arsanjani and the United States each sought and obtained an expert report from an arborist to opine on the standard of care owed by Defendants with respect to this tree and whether such standard was breached.  D.C. did not retain an expert on this issue.  The United States' expert Russell Carlson is an arborist with 44 years of experience.  See ECF No. 43 (U.S. MSJ) at 1, 5. While the details of his 27-page report are not relevant here, it is sufficient to understand that, after reviewing a collection of documents — including images of the tree, deposition transcripts of various individuals with insight into the incident, and the Smithsonian's tree-maintenance records — Carlson concluded that "the Smithsonian staff met their criteria for inspection and maintenance [of the tree]" and that the branch's "failure was not reasonably predictable."  ECF No. 43-9 (Carlson Report) at 1.

Plaintiff's expert arborist Lew Bloch disagreed.  Bloch also has extensive experience, including the hundreds of tree-risk consultations that he conducts each year.  See Opp. to U.S. MSJ at 7.  His expert report concluded that a proper "inspection by an experienced arborist should have observed" the "excessive end weight and poor taper of the large limb that failed." ECF No. 47-3 (Bloch Report) at 4.  An experienced arborist, he continued, also should have "had [the structural problem] abated by instituting a proper and common pruning technique known as crown reduction."  Id.

The parties have now completed discovery, and both Defendants have moved for summary judgment.

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  The Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for

trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.    Analysis

Defendants seek summary judgment on Plaintiff's two negligence claims, both of which are ultimately governed by D.C. law.  See Opp. to U.S. MSJ at 1 (describing Count I as FTCA claim); Tri-State Hosp. Supply Corp. v. United States, 341 F.3d 571, 576 (D.C. Cir. 2003) (holding that under FTCA, law of state where tort occurred establishes elements of the actionable tort); Am. Compl., ¶¶ 23–29 (Count II state-negligence claim).  "In an action for negligence [in D.C.], the plaintiff has the burden of proving, by a preponderance of the evidence, [1] the applicable standard of care, [2] a deviation from that standard by the defendant, and [3] a causal relationship between the deviation and the plaintiff's injury."  D.C. v. Wilson, 721 A.2d 591, 597 (D.C. 1998) (citation and internal quotation marks omitted).  As for the first requirement, D.C. law requires that "[a] plaintiff . . . put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson."  Briggs v. WMATA, 481 F.3d 839, 845 (D.C. Cir. 2007) (citation and internal quotation marks omitted).  The parties agree that this is such a case.  They therefore obtained the expert reports mentioned earlier.  See U.S. MSJ at 10–11; Opp. to U.S. MSJ at 8.  The opinion of Plaintiff's expert Lew Bloch is at the center of the parties' dispute at this stage.

Both Defendants take issue with his testimony.  The United States principally argues that his report and testimony should be excluded under Federal Rule of Evidence 702, which governs the admissibility of expert testimony in federal proceedings.  See generally U.S. MSJ.  Striking

Bloch's report and testimony would require this Court to enter judgment in favor of both Defendants, as Plaintiff has offered no other expert who could testify to the standard of care that she believes she was owed here. Beard v. Goodyear Tire & Rubber Co., 587 A.2d 195, 200 (D.C. 1991) ("If the plaintiff fails to present sufficient evidence to establish the applicable standard of care, the court must enter judgment for the defendant.").

The city presses an alternative route to judgment. It briefly contends that even if admissible, Bloch's report and testimony would be insufficient as a matter of law to establish the existence of a national standard of care applicable in this case. See ECF No. 42 (D.C. MSJ) at 8 ("An expert witness offering an opinion must cite national standards to support his or her opinion. Bloch could not identify [such a] standard.") (citations omitted); see Varner v. D.C., 891 A.2d 260, 270 (D.C. 2006). That would be an independent reason to grant summary judgment to Defendants.

It is worth observing that sufficiency under D.C. law is very closely related to admissibility in this context: both inquiries require consideration of the expert's methodology and reasoning, as well as analysis of the level of support for the proffered standard of care. Indeed, they are similar enough that the United States, perhaps understandably, conflates the two in its Motion. See U.S. MSJ at 16–19 (invoking D.C. case law on sufficiency to make admissibility argument). That conflation and potential overlap notwithstanding, the questions are analytically distinct. Cf. Varner, 891 A.2d at 270 (expert testimony about standard of care may be admissible while still being insufficient to prove that standard is established). The Court will therefore treat the two issues separately, beginning with admissibility.

A.  <u>Admissibility of Bloch's Report and Testimony</u>

A district court has "broad discretion in determining whether to admit or exclude expert testimony."  <u>United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.</u>, 608 F.3d 871, 895 (D.C. Cir. 2010) (citation and internal quotation marks omitted).  Federal Rule of Evidence 702, which governs the admissibility of such testimony, provides that a qualified expert may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, trial courts are required to act as gatekeepers who may admit expert testimony only if it is both relevant and reliable.  <u>See</u> <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 589 (1993); <u>Calvetti v. Antcliff</u>, 346 F. Supp. 2d 92, 110–11 (D.D.C. 2004) (describing "gatekeeping function" of district court).

"While a <u>Daubert</u> analysis at the summary judgment stage may seem premature or, at least, unconventional, [a] trial court has discretion to conduct the reliability and helpfulness analysis that <u>Daubert</u> and Rule 702 require in the context of a summary judgment motion, and to exclude expert testimony found wanting from its consideration in ruling on the motion."  <u>Carmichael v. West</u>, No. 12-1969, 2015 WL 10568893, at *7 (D.D.C. Aug. 31, 2015) (internal citation and quotation marks omitted).  In some cases, courts have imposed a heightened burden to exclude expert testimony at this stage.  <u>D.L. v. D.C.</u>, 109 F. Supp. 3d 12, 28 (D.D.C. 2015). They reason that courts should be wary of "exclud[ing] debatable scientific evidence [at summary judgment] without affording the proponent of the evidence adequate opportunity to defend its admissibility."  <u>Cortés-Irizarry v. Corporación Insular de Seguros</u>, 111 F.3d 184, 188

(1st Cir. 1997).  That rationale does not apply in this case.  Both experts have had ample opportunity to defend their reports in depositions appended to the briefing here, and the Court does not find their testimony to be on a subject so overly scientific or complex that an additional hearing would alter the admissibility analysis.  The Court will thus weigh the Rule 702 factors as it normally would.

The United States does not contest Bloch's qualifications.  It contends, however, that his testimony is still inadmissible because (a) it is not the product of reliable principles and methods, and (b) it is based on insufficient facts or data.  The Court will consider each argument in turn.

### 1.  *Reliable Principles and Methods*

Rule 702(c) requires that an expert's "testimony [be] the product of reliable principles and methods."  The reliability inquiry is flexible.  Trial courts have substantial "latitude [both] in deciding <u>how</u> to test an expert's reliability" and in deciding "<u>whether or not</u> that expert's testimony is reliable."  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999).  As "gatekeeper," "the district court must focus 'solely on principles and methodology, not on the conclusions that they generate.'"  <u>Ambrosini v. Labarraque</u>, 101 F.3d 129, 133 (D.C. Cir. 1996) (citation omitted).  The Court ultimately finds that Bloch does not pass 702(c)'s test.

According to Plaintiff, the crux of his testimony is as follows: the fallen limb "had excessive end weight as well as poor taper" that an arborist should have noticed in a proper inspection, <u>see</u> Bloch Report at 3, and "the standard of care [here] required pruning (cutting back) of th[e] [fallen] branch."  Opp. to U.S. MSJ at 12.  That crucial testimony is not supported by any principle or methodology, much less a reliable one; instead, it is based in large part on Bloch's subjective observations of a photo of this particular tree.

Before proceeding to explain why that is so, it bears noting that Bloch's testimony, as just summarized, conflates the two state-law elements of negligence for which his expertise is necessary: "establish[ment] [of] the applicable standard" (standard of care) and "prov[ing] that the defendant failed to adhere to it" (breach).  Beard, 587 A.2d at 200.  It is therefore challenging to tease out the portions of his report that are devoted to one issue or the other.  See, e.g., Bloch Report at 3 (conclusion that branch had "excessive end weight" and should have been pruned contains both an assumption about standard of care owed — *i.e.*, conditions under which the Smithsonian should prune a branch — and conclusion about breach — *i.e.*, this branch was past that threshold).  The sole question for the Court at this analytical juncture, however, is whether his "testimony" as a whole is based on "reliable principles and methods."  Fed. R. Evid. 702(c). The answer to that question is "no," regardless of how the Court conceptualizes particular portions of his testimony — *e.g.*, related to standard or related to breach.  So, while the Court will for the sake of clarity signal where Bloch's statements seem more related to one or the other, its ultimate conclusion on admissibility does not depend on those classifications.

Moving now to the heart of the admissibility issue, consider first the surprisingly brief portion of the expert report that is devoted to his core set of conclusions:

> The specific problem with the structure of this tree was the long semi-horizontal limb that spanned well over the roadway, intersection, and sidewalk and is depicted in the photo on page 6. The limb had excessive end weight as well as poor taper that made this tree part a high risk situation.  This hazardous situation had been in the tree for many years before the failure and should ha[ve] been abated.

Bloch Report at 3.  Beginning with his conclusions that sound more in breach, Bloch does not provide reasons for finding that the limb was excessively heavy and long or had poor taper.  Nor does he explain the methodology he applied to reach the conclusion that the "hazardous situation

had been in the tree for many years."  A reader is thus left to assume that he arrived there predominantly via a subjective analysis of the "photo on page 6," which is a Bing Maps photo of the tree from 2014, two years before the incident.  Id.

Bloch's deposition testimony confirms that assumption.  When attorneys for Defendants pressed him for a concrete methodology that guided his assessment of this branch's size and weight, they had the following exchange with him:

> Q: [Y]ou don't know how long the branch was.  Correct? . . . And [y]ou also don't know how much it weighed before it fell, correct?
> A: Correct.  I had no desire to know every one of those [things] . . . because they're not important to me.
> Q: Why aren't they important?
> A: The limb was too long and the limb was heavy enough to do damage.  It doesn't . . . make any difference to me [what it weighed or how long it was].  None of those statistics mattered to me.
> Q: You could tell based on a photograph that this limb was too long and too heavy?
> A: Yes, sir.  That's my testimony.

ECF No. 47-4 (Bloch Deposition) at 73–74 (emphasis added).  His answers confirm that rather than apply reliable principles to the facts before him, Bloch primarily relied on his subjective beliefs about the state of the branch (what he could "tell" from a photo) to reach conclusions about what the Smithsonian should have done but did not do.  That is exactly the type of testimony that this Court must take care to exclude in its role as gatekeeper.  Ambrosini, 101 F.3d at 134 ("Daubert . . . focuses on the court's 'gatekeeper' role as a check on 'subjective belief' and 'unsupported speculation.'").

It is conceivable that Bloch would claim that assessing the risks posed by a tree using only one photograph is a "methodology" of sorts.  Even assuming that were true, however, this Court cannot be confident that his methodology was a reliable one.  Indeed, even Bloch does not have full confidence in his methods.  When asked if an assessment of a tree using only

photographs is reliable, he did not answer in the affirmative.  Instead, he asserted that it was

reliable "in this specific case, [because] as soon as I saw that photograph, it hit me like a

bullseye.  Now, if that limb hadn't been so big and so long and extended out so far, I would have

had a difficult time doing a risk assessment."  Bloch Dep. at 73; see also id. at 74–75 (Bloch

suggesting that he simply does risk assessments "the best way [he] can" and that there is "no

minimum, no maximum" amount of information he would need to make a reliable assessment);

id. at 75 ("I have to deal with what I deal with.  In this case, it was the Bing photograph").  Once

again, that testimony rings like a "know it when you see it" approach, which is quintessentially

subjective and casts a shadow of unreliability over the report.

The absence of a reliable methodology becomes even starker — and this question less

close — when one homes in on the most important conclusion in Bloch's report, which is not his

personal assessment of the branch (an issue that relates more to whether a standard of care was

breached), but rather his opinion on the precise standard of care owed here.  Briggs, 481 F.3d at

845 (noting that expert testimony is necessary in cases like this to "establish what the standard of

care is") (emphasis added).  As to that particular conclusion, the Court is even more hard pressed

to discern reasoning or a methodology backing Bloch's findings.  Consider the following

exchange:

> Q: Is there any protocol pertaining to how long or how much a
> limb should weigh with the particular tree at issue?
> . . .
> A: I don't know how to answer.  There's — I've never heard of
> any protocol about how long a limb should be or how much it
> should weigh if that's the question.

Bloch Dep. at 51.  If that is the case, the Court struggles to understand how Bloch could reliably

conclude that this particular branch's end weight was "excessive."  When asked how often

pruning of a tree should occur, moreover, Bloch stated that "[t]here is no standard."  Id. at 56;

see also id. at 74 (Q: Is there a national standard that says you can do a level one risk assessment based on a photograph? . . . A: I don't know of any such standards of how you — I mean, you do them the best way you can.).

These admissions reveal that, even if a national standard could be detected somewhere in the pages of Bloch's report (which, as it will explain in section III.B, this Court doubts), it is unlikely that Bloch would have arrived at such standard by reliable methods, as opposed to by his own subjective beliefs about when pruning is required.  United States ex rel. Morsell v. Symantec Corp., No. 12-800, 2020 WL 1508904, at *13 (D.D.C. Mar. 30, 2020) ("[C]ourts [evaluating negligence claims] generally do not accept expert testimony on what is reasonable practice in a given industry based solely on an expert's own evaluation.").

In response to this broader critique, Arsanjani maintains that the principle or method on which Bloch relied was his experience coupled with extensive familiarity with national standards.  See Opp. to U.S. MSJ at 9, 12–13.  Defendants do not dispute that Bloch is experienced, and it is true that an "expert need not employ a rigorous analytical methodology if the expert is instead qualified on the basis of his or her practical experience or training." Symantec Corp., 2020 WL 1508904, at *13 (citations and internal quotation marks omitted).  If, however, "the witness is relying . . . primarily on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702, Advisory Comm. Notes; see also Symantec Corp., 2020 WL 1508904, at *13 (discussing this rule). Indeed, that proposition follows naturally from Daubert, which reflected a concern with courts' reliance only on "the experts' qualifications, their conclusions and their assurances of

reliability." Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1319 (9th Cir. 1995) (applying Supreme Court's ruling in Daubert).

Contrary to the spirit of Rule 702, nothing in the record or Plaintiff's briefs, much less in the report itself, provides any explanation for how Bloch's experience either led him to a conclusion about the standard of care owed here or otherwise rendered his subjective assessments reliable. See Fed. R. Evid. 702, Advisory Comm. Notes (expert should "explain how [his] experience leads to the conclusion reached"). It does not, for example, mention how any previous work examining other structurally unsound trees might have equipped him to accurately assess the risk posed by this particular branch based on a photograph of the branch two years before it fell. Nor does the report defend the proposition that the author's experience, coupled with his observations, forms a "sufficient basis for [his] opinion" that the size and taper of this branch were such that an arborist should have pruned it. Id. Indeed, Bloch makes his sole reference to his own experience in a concluding paragraph, and only in the most general of terms. See Bloch Report at 5 (noting that report was "prepared in conformity with standard arboricultural practices, and [his] expertise and experience as a consulting arborist").

Courts in this district have held that such cursory references to experience, without more, cannot satisfy Rule 702's reliability requirement. See, e.g., Davenport v. Safeway, Inc., No. 20-1207, 2022 WL 4379016, at *6 (D.D.C. Sept. 22, 2022) (excluding expert testimony on standard of care where expert "[did] not state, either in his expert report or deposition testimony, how his experience or training inform[ed] his testimony" and where he could not "point to a specific book or topic" that led him to his conclusions); see also Peters-Martin v. Navistar Int'l Transp. Corp., 410 F. App'x 612, 623 (4th Cir. 2011) (affirming district court's exclusion of testimony from expert whose reports failed to fulfill Rule 702's requirement of linking experience to

conclusions reached); <u>United States v. Nacchio</u>, 555 F.3d 1234, 1258 (10th Cir. 2009) (same).  In reaching this conclusion, the Court does not intend to demand lengthy, detailed recitations of an expert's experiences and their application to each and every conclusion.  It finds only that where, as here, the connection drawn by the expert between his experience and conclusions is not just tenuous but never elucidated at all, it would be abdicating the Court's gatekeeping function to find the testimony reliable based only on the expert's perfunctory assurances of his own qualifications and experience.

The same goes for Bloch's invocation of national standards and arboriculture literature. Following his observations about the tree, he includes in his report a bullet-point list containing cursory summaries of various "national citations discussing" the types of flaws he identified in the subject branch.  <u>See</u> Bloch Report at 3.

> • In the Matheny/Clark Hazard Tree Evaluation book, they state that "Normally upright branches which become horizontally oriented with age <u>are more prone to failure</u>." They also <u>list tree defects</u> of excessive end weight, distribution of weight, and poor branch taper that <u>need to be considered</u> in hazard tree evaluation.
> • In the ANSI A-300 Standard in Annex B as a <u>check list for risk assessments</u>, they list branch aspect ratio, branch distribution, and unusual tree architecture.
> • In the Arboriculture book, <u>they discuss the tree hazard problems</u> of excessive end weight and poor taper.
> • In the ISA Manual, they <u>discuss the problems</u> of excessive end weight and poor taper and state that <u>in mitigation options</u>, "<u>The first choice is to prune</u> to reduce the end weight and extension of the branch."

<u>Id.</u> at 3–4 (emphasis added).  To be sure, that literature as described appears to lend reliability to <u>some</u> conclusions that are related to the core issue here: for example, excessive end weight and poor branch taper "need to be considered" in tree evaluations (Matheny/Clark), "excessive end weight and poor taper" pose "tree hazard problems" (Arboriculture book), and the "first choice" option when faced with such problems is pruning (ISA Manual).

The problem, however, is that those are not the ultimate conclusions Bloch reaches in his report.  His testimony, framed in the light most favorable to Plaintiff and connecting dots he does not himself connect, goes much further and provides that: the standard of care applicable here is that arborists should prune excessively heavy horizontal branches with poor taper, this was such a branch, and the Smithsonian breached the standard by failing to prune the branch.  Id. at 4 (arborist "should have . . . had [the problem in this branch] abated by . . . pruning").  Those are the conclusions Plaintiff seeks to present to the jury and that this Court must therefore assess for reliability under Rule 702.  Yet Bloch does nothing to show that his "national citations" support and thus render reliable any part of that testimony, despite it being his burden to do so.  See, e.g., Bloch Dep. at 42–43 (Q: And with these . . . national documentation[s], how do they assist you with your report?  A: Well, I don't — it just dealt with the trees should be inspected.); see also Milward v. Rust-Oleum Corp., 820 F.3d 469, 473 (1st Cir. 2016) ("The party seeking to introduce the evidence has the burden of establishing both its reliability and its relevance.").  He does not, for example, suggest that the "citations" support his conclusion that this branch was excessively heavy.  Nor would that be a permissible inference from his descriptions of the publications; a book could certainly "discuss" a problem without providing nationally accepted guidelines on how to identify said problem or how the issue should be — not just could be — addressed.  See López-Ramírez v. Toledo-González, 32 F.4th 87, 95 (1st Cir. 2022) (finding expert testimony unreliable in part because expert failed to "relate the content of [cited] publications to" his core conclusions).  That such an inference would be incorrect is in fact confirmed by Bloch's deposition, where he admitted his lack of knowledge of national standards governing the identification and mitigation of the various problems his citations identify.  See, e.g., Bloch Dep. at 51, 56, 75; see also id. at 47 (stating that cabling "could help" with problems

like the ones present in this branch, thus implicitly admitting that pruning is not only way to

address such issues).  In short, while this is a somewhat close question, there is "too great an

analytical gap between the [citations] and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522

U.S. 136, 146 (1997).

 The various cases Plaintiff cites in support of her argument are distinguishable.  In Heller

v. D.C., 952 F. Supp. 2d 133 (D.D.C. 2013), for example, this Court admitted an expert's

experience-based testimony, but only after finding that his reports "provide[d] some justification

— in the form of information gained from [that] expert's relevant experience — for those

opinions."  Id. at 142.  Bloch's report contains no such justification, nor could it, as Bloch never

connects particular relevant experience to his conclusions.  See Bloch Report at 3, 5.

 Plaintiff also invokes Walen v. United States, No. 15-1718, 2019 WL 4261160 (D.D.C.

Sept. 9, 2019), another falling-branch case.  See Opp. to U.S. MSJ at 13.  There, like here, a

woman sued the United States and the District of Columbia for negligence after she was struck

by a tree limb, and she called Lew Bloch as an expert on the standard of care.  Walen, 2019 WL

4261160, at *1.  Judge Beryl A. Howell of this district found Bloch's testimony admissible.  Id.

at *13.  While Arsanjani is correct to point out the many similarities between that case and this

one, the United States identifies various critical differences.  See U.S. MSJ at 21–23.

 Specifically, the Court is persuaded by the argument that Bloch's deposition testimony

here justifies a contrary outcome.  As the United States points out and as this Court just

discussed at length, Bloch all but confessed in his deposition, for example, that the standard of

care he purported to provide in his report was not derived from concrete, national protocols or

requirements.  Id. at 22; see also Bloch Dep. at 74.  In Walen, by contrast, he made no such

admissions.  See U.S. MSJ at 22; Opp. to U.S. MSJ at 3–4 (noting that Bloch was not deposed in

Walen).  Judge Howell thus did not have similar grounds for doubting the reliability of his report.  The deposition thus confirms that the flaws that are readily identifiable in his rather conclusory report are not just problems that go to the strength of his testimony, as the Court concluded in Walen; instead, they cast doubts on the report's reliability and on the ability of his experience to sustain the conclusions he reaches.

Ultimately, neither Bloch's report nor his deposition reveals the sort of reasoning or methodology an expert must rely on under Rule 702.  The Court is thus constrained to find that his testimony is inadmissible.  Such a holding means that summary judgment is warranted for both Defendants.

### 2.  *Sufficient Facts or Data*

The United States separately contends that Bloch's testimony also fails to satisfy Rule 702(b)'s requirement that expert testimony be based on sufficient facts or data.  On this point, however, it does not prevail.

Recall that in his report, Bloch explained that his assessment of the fallen limb's length and weight was based on a Bing photograph from 2014.  See Bloch Report at 3 (citing 2014 photo in assessment of tree's structural problem).  The only other photographs he saw were of the interior of the fallen branch and of the point of breakage; none of those photos depicts enough of the branch to assess its length or weight, and none predates the incident either.  See Bloch Report at 8.  Bloch, moreover, did not review Smithsonian maintenance reports prior to preparing his report.  See Bloch Dep. at 26.  The United States maintains that Bloch's near-exclusive reliance on the 2014 photo, coupled with gaps in his preparation for drafting the report, means that his testimony is based on insufficient facts or data.

There is something to that argument.  The tree branch in question did not fall until June 2016, nearly two years after the Bing photo was taken.  In that two-year span, the Smithsonian's maintenance records reveal that it pruned the tree twice — once in November 2014 and once in October 2015 — and performed various other treatments on the tree that are less relevant here.  See ECF No. 47-8 (After Action Report) at 4.  In drafting his report, though, Bloch could not have possibly known about those maintenance activities because he had not yet read the relevant maintenance records.  See Bloch Dep. at 26.  He also never saw, and still has not seen, what the tree looked like after those steps were taken and before the branch fell.  Indeed, the only image of the pre-accident tree that he has seen is from 2014.  Despite that obvious gap in his knowledge, his Report is replete with conclusions about the state of the branch when it fell in June 2016.  It also contains various conclusions about what abatement measures were or were not taken before the incident.  See, e.g., Bloch Report at 4 ("[T]his defect was apparent for many years prior to the casualty."); id. ("[A]n experienced arborist should have . . . institut[ed] a proper and common pruning technique known as crown reduction.").  The Court struggles to understand how such conclusions could be anything but speculative given Bloch's ignorance about the state of the tree at any point in the near two-year span after the Bing photo was taken and before Arsanjani's fateful day.

Plaintiff retorts that after drafting the report and before his deposition, Bloch did review a host of other documents, including the Smithsonian maintenance records.  See Opp. to U.S. MSJ at 7.  While his preparation for the report may have been too limited, Arsanjani contends that his deposition testimony compensated for those limitations and was based on sufficient information.  Id. at 11–12.  That may well be true.  See Bloch Dep. at 48–49 (suggesting that his review of Smithsonian maintenance records confirmed that "there was no crown reduction done on [the]

limb"). Although Rule 26(a)(2) permits experts to <u>clarify</u> their reports via deposition, however, it "does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony." <u>Ciomber v. Coop. Plus, Inc.</u>, 527 F.3d 635, 642 (7th Cir. 2008); <u>see also</u> Fed. R. Civ. P. 26(a)(2)(B)(i) (expert's written report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them"). Courts have gone so far as to exclude expert deposition testimony as a sanction for such attempted supplementation. <u>Ciomber</u>, 527 F.3d at 643.

That might have worked in Defendants' favor had they asked the Court to strike Bloch's deposition testimony. <u>See</u> Fed. R. Civ. P. 37(c)(1) (court may strike information that was not properly disclosed pursuant to Rule 26(a) unless failure was "harmless"). They not only did not do so, but they also relied extensively on that testimony to undermine the reliability of Bloch's methods, as discussed above. Out of fairness to Plaintiff, the Court will thus refrain from striking the deposition testimony. Supplemented by such testimony, these informational gaps in Bloch's report (as to sufficient facts and data) largely fall away, as do the United States' arguments on this front. <u>See</u> U.S. MSJ at 16 (accusing Bloch Report, but not deposition, of being based on insufficient facts or data). This rationale therefore does not independently justify striking Bloch as an expert.

B. <u>Sufficiency of Report and Testimony</u>

Although the Opinion could end here, the Court will grant summary judgment to Defendants for a second and independent reason. Assuming Bloch's testimony were admissible, the District (joined by the United States, albeit in an incorrectly framed argument) contends that summary judgment is still warranted because he failed to articulate a national standard governing Defendants' conduct in this case. <u>See</u> D.C. MSJ at 8; U.S. MSJ at 16–20 (making this argument

but mistakenly labeling it an admissibility issue).  The Court interprets this as a sufficiency

argument.

### 1.  *Sufficiency of Standard-of-Care Testimony*

Under D.C. law, "[w]here expert testimony is necessary" to prove a standard of care, that

testimony "is not sufficient if it consists merely of the expert's opinion as to what he or she

would do under similar circumstances." Clark v. D.C., 708 A.2d 632, 635 (D.C. 1997) (quoting

Messina v. D.C., 663 A.2d 535, 538 (D.C. 1995)); see also U.S. MSJ at 16–17 (citing this

discussion in Clark).  It is also not enough "for the expert simply to declare that the District

violated the national standard of care." Clark, 708 A.2d at 635.  Instead, she "must clearly

articulate and reference a standard of care by which the defendant's actions can be measured,"

and she must "relate th[at] standard . . . to the practices in fact generally followed by other

comparable governmental facilities or to some standard nationally recognized by such units." Id.

(quoting Messina, 663 A.2d at 538).  The testimony must "allow a jury to compare the

requirements of a specific 'standard' with [a defendant's] conduct." Briggs, 481 F.3d at 847.

It is this bar that Bloch does not clear.  Begin with the first half of his report.  There, he

discusses the type of risk assessment that should have been performed on the elm. See Bloch

Report at 2–3.  Specifically, he opines that under the American National Standard Institute

(ANSI) A300 Standard for tree-risk assessments, the area where this tree was planted should

have been regarded as "high risk." Id. at 3.  The elm therefore should have been subject to a

level 1 assessment, which includes a "limited visual assessment . . . to identify specific

conditions or obvious defects, and shall be from a specific perspective such as foot or vehicle."

Id.

So far so good: that is indeed a standard by which Defendants' actions could be measured, and it appears to be "nationally recognized" among experts and professionals.  <u>Clark</u>, 708 A.2d at 635.  The problem, however, is that Plaintiff does not allege a breach of <u>that</u> standard.  Quite the opposite.  She explains that the parties are actually "in agreement that the area where [Arsanjani] was injured . . . constituted a high risk [area] by applicable national rating standards."  Opp. to U.S. MSJ at 2.  It is also uncontested that the Smithsonian's arborist, Huse, conducted an on-the-ground, visual risk assessment of the tree in 2014, and that the tree was being monitored in the years thereafter.  <u>See</u> After Action Report at 4 (complete risk assessment performed in April 2014, and various other treatments performed on tree in following months up to and including June 2016).  To the extent the appropriate standard of care here dictated that Defendants classify the tree as high risk and assess it as such, that was accomplished.  <u>Cf.</u> Opp. to U.S. MSJ at 10 ("The logic of the Plaintiff's expert is not dependent on prior Smithsonian actions.  Whether the overall risk strategy was adequate is irrelevant to this case.").

What, then, is the standard of care that Defendants breached?  The Bloch report is frustratingly imprecise on this question, but Plaintiff's brief helps guide the Court.  At various points, Arsanjani suggests that the duty Defendants breached was that of "properly assess[ing]" the tree.  <u>See, e.g.</u>, <u>id.</u> at 4.  More specifically, she contends that in "Plaintiff's expert's opinion . . . , a properly conducted risk assessment . . . should have resulted in significant pruning (cutting back) of the branch in question."  <u>Id.</u> at 14.  It was thus the "failure to prune the branch in question that [was] in violation of the standard of care."  <u>Id.</u>; <u>see also</u> <u>id.</u> at 12 ("[Bloch] concluded that the standard of care required pruning (cutting back) of that branch."); <u>id.</u> at 4 ("Defendant breached [its] duty in failing to properly assess the subject limb as one with a structural defect which if not abated was a[t] foreseeable risk" of falling.).

Working backwards from the purported breach, one might expect the relevant standard of care to be one against which an expert could judge the adequacy of a risk assessment or the reasonableness of a decision not to prune a branch.  See Briggs, 481 F.3d at 847.  Such a standard might establish the "proper" way to conduct a risk assessment (how else could Bloch conclude that the Smithsonian's assessment was improper?).  Or it might comprise specific factors that a professional must consider in assessing whether a branch on any given tree needs to be pruned or is otherwise at high risk of falling (in which case perhaps the breach arose in the Smithsonian's inattention to certain red flags present in the branch that injured Plaintiff).  In sum, the goal is for the expert's standard-of-care testimony to permit a jury to compare Defendants' actions or inactions to the applicable standard of care, which standard the expert must show "ha[s] been promulgated, or [i]s generally known."  Id. (quoting Messina, 663 A.2d at 539).

Bloch's report does not achieve that goal.  His report is scattered with allegations about this particular tree, including that the Smithsonian's risk assessment was improper, and that the fallen limb was too long, too heavy, had poor taper, and thus should have been pruned.  See Bloch Report at 3–4.  What the report does not contain is any generally known standard by which Bloch determined that the assessment was deficient, that the branch's weight and length were excessive, that the taper was "poor," or — more generally — that the Smithsonian should have pruned a branch like this one.  In fact, he admitted as much in the course of his deposition: "I've never heard of any protocol about how long a limb should be or how much it should weigh."  Bloch Dep. at 51.  His testimony, even if phrased like a standard of care ("an experienced arborist should have observed this structural problem and had it abated," Bloch Report at 4), thus amounts to nothing but his "opinion as to what he . . . would [have] do[ne]

under similar circumstances": prune what he believed to be an excessively heavy branch with poor taper.  Clark, 708 A.2d at 635; see, e.g., Opp. to U.S. MSJ at 13 ("Plaintiff's expert's opinion . . . can be summarized thusly, a properly conducted risk assessment . . . should have resulted in significant pruning . . . of the branch in question."); 57A Am. Jur. 2d Negligence § 173 ("[T]he professional standard remains an objective standard, and it is error to permit a jury to consider the professional's own particular experience and training . . . in determining the requisite standard of conduct, rather than applying a minimum standard generally applicable to all persons in the profession.").  That does not a sufficient standard of care make.  See Toy v. D.C., 549 A.2d 1, 8 (D.C. 1988) (finding insufficient standard-of-care testimony where expert "did not refer to . . . written standards or authorities as support for his opinion" and also "gave no indication of how many [actors like defendant] throughout the country" abided by that standard).

Arsanjani, for her part, repeatedly asserts that Bloch based his opinion "upon numerous sources of literature comprising the national standards of arboriculture."  Opp. to U.S. MSJ at 3; see also id. at 7; Opp. to D.C. MSJ at 9 ("Bloch based his opinion, in part, upon ten (10) identified national standards, books, and/or treatises.").  She is presumably referring to the list of publications, or so-called "national citations," Bloch offers in his report.  See Bloch Report at 2– 4.  Her argument cannot carry the day.  As this Court explained above, Bloch fails to show that those publications illustrate or support the existence of a national standard of care applicable here; they simply discuss issues similar to the ones that were present in this tree.  See supra section III.A.1.  Even if such a standard were somewhere to be found in the pages of those citations, moreover, Bloch unequivocally stated in his deposition that he was unaware of it.  See, e.g., Bloch Dep. at 51.  He therefore could not testify to its existence anyway.

Finally, the Court finds it telling that even Plaintiff, who had ample time to dissect her expert's testimony and brief this issue, was unable to pull any specific standard from his report, deposition answers, or even from the "literature" he cites.  See, e.g., Opp. to D.C. MSJ at 9 (invoking "ten . . . national standards" but not identifying any particular one); Opp. to U.S. MSJ at 7 (citing "publications which evidenced a national standard," but not specifying what that standard is or which publications stand for which standard).  Like Bloch, she instead falls back on the position that "[t]he national standard required that this particular branch be pruned."  Opp. to U.S. MSJ at 8; id. at 12–13 (Bloch concluded that Defendant "had not engaged in the appropriate conduct because [this] branch had not been pruned."); Opp. to D.C. MSJ at 9.  A standard that governs only one branch of one tree is not a national standard at all.

In sum, then, Bloch's testimony — not just taken at face value, but also as characterized (presumably favorably) by Plaintiff and viewed in the light most sympathetic to her — fails to sufficiently establish a national standard of care applicable here.

2. *Analogous Cases*

Should a reader remain unconvinced, a pair of cases applying this body of law makes clear that Bloch's testimony is insufficient to establish an applicable standard of care.

First, consider Varner v. D.C., 891 A.2d 260 (D.C. 2006).  In that case, Plaintiffs were the parents of a student at Gallaudet University who was murdered by his classmate Joseph Mesa.  Id. at 263–64.  The Varners claimed that the University had acted negligently when it failed to expel Mesa for committing "a number of major thefts and other offenses" over a year before the murder.  Id. at 264.  The University had instead suspended him for one year and permitted him to continue living in the student dormitory, which is where he eventually murdered Varner and another student.  Id. at 264 n.3.  In Varner, as here, Plaintiffs were required

to present expert testimony "to establish the standard of care and its breach." Id. at 267.  They

therefore relied on the testimony of Dr. Brooks, an expert on the "subject of the disciplining of

students for wrongdoing against other students." Id. at 268.

Brooks concluded that Gallaudet's disciplinary policy was "poor policy, and not in

keeping with the accepted practice or within the standard of care. . . . [I]t was a gross breach of

the required duties and the standard of practice for Gallaudet to suspend Joseph Mesa for only

one year." Id. The D.C. Court of Appeals found his testimony insufficient to establish a national

standard.  It noted that "[o]ther than his own personal opinion[,] . . . Dr. Brooks was unable to

suggest any recognized standard, written or oral, which addressed the question whether

imposition of a one-year suspension was unreasonable in a case such as Mesa's." Id. at 268.

The same is true here.  Bloch failed to point to "any recognized standard" addressing whether the

Smithsonian's failure to prune the fallen branch was unreasonable in this case.

In Varner, the court also found it highly problematic that "Dr. Brooks acknowledged,

under examination by counsel for the University, that he knew of no such standard." Id. He was

asked, for example: "Is there any standard stated orally or in writing that you're aware of that

required — would have required expulsion of Mr. Mesa in the spring of 1999?," "Is there any

written standard other than a national standard that you think requires [the same]?," and "Is there

something you could point to and say, . . . it was everyone's agreement at the conference on

student affairs, and we took a voice vote?"  Brooks responded in the negative to each of those

questions. Id. at 268–69.

That exchange is remarkably similar to Bloch's exchanges with counsel for Defendants in

this case.  Asked about a standard for an appropriate length and weight for a tree limb, Bloch

stated that he had "never heard of [one]."  Bloch Dep. at 51.  Asked how long was "too long" for

a limb, Bloch simply asserted his opinion "that approximately one-third of the end of [this particular] limb should have been cut off."  Id. at 50.  Asked how often pruning should occur, he confessed, "There is no standard."  Id. at 56.  Asked if the "standard of care . . . dictate[s] that a tree should be inspected every year," he responded, "No, sir.  These are guidelines.  These are not . . . requirements and they're not standards."  Id. at 73.  And, finally, asked if there is a "national standard that says you can do a level one risk assessment based on a photograph," which is what Bloch did, he responded, "I don't know of any such standards."  Id. at 74.

"The foregoing questions were not ones that it should have been impossible for [Bloch] to answer."  Varner, 891 A.2d at 269.  He has decades of experience as an arborist and has done an enormous number of consultations.  Yet he could not identify "any particular criteria on the basis of which a choice" between pruning a particular horizontal branch and not pruning it "[is] generally made, or ought to be made."  Id.  Like Dr. Brooks, "the only standard offered by [Bloch] was his own opinion," id., that a "large, long, extended, horizontal" branch like this one should have been pruned.  See Bloch Dep. at 85.  D.C. courts have "repeatedly held that such testimony is insufficient."  Varner, 891 A.2d at 269.

The D.C. Court of Appeals' decision in Pannell v. D.C., 829 A.2d 474 (D.C. 2003), is also informative.  There, an expert was called to testify about the standard of care owed by the District of Columbia to prisoners in its custody.  Id. at 475, 479.  The court held that the expert's testimony was "insufficient to prove a national standard of care" because he could "only state generalized duties" owed by the District and "offer his own conclusory opinion 'that the standard of care was violated.'"  Id. at 479.  The court added that while the expert referred to a "document entitled 'Standards for Law Enforcement Agencies,'" that reference was unhelpful because "he did not mention any particular standard that might be found in that document."  Id. at 479–80.

Once again, the parallels to Bloch's testimony are legion.  While Bloch may have gestured toward "generalized duties" owed by Defendants to prune excessively long branches or to notice when a branch is too heavy and has poor taper, he could not identify with particularity a standard of care that was breached.  See, e.g., Opp. to U.S. MSJ at 8 (noting that branch's poor structure existed for years "without abatement in accordance with national standards," but never identifying what those "national standards" require as a general matter).  The D.C. Court of Appeals' reasoning in Pannell also confirms that Bloch's references to a list of "national citations" and Plaintiff's invocations of the same do not cure the deficiencies in his testimony.  Here, as in Pannell, Bloch failed to "mention any . . . standard that might be found in [those] documents."  829 A.2d at 480.

The Court thus concludes that Bloch's testimony is insufficient to prove an applicable standard of care.  "Without this necessary expert testimony, [Arsanjani] could not prove an essential element of [her] claim, and therefore" summary judgment is proper in favor of Defendants.  Id.

\*       \*       \*

Before concluding, a word on two final matters.  First, because this Court would grant summary judgment to both Defendants based on either of the two grounds just mentioned, it need not reach the District of Columbia's alternative (and principal) contention that it did not owe Plaintiff any duty because it "neither owned nor maintained the Elm tree" that caused the injury.  See D.C. MSJ at 1.  Second, the Court need not analyze the United States' Motion to Strike a belated affidavit from Bloch that Plaintiff appended to her Reply Brief, see ECF No. 50 (U.S. Reply and Mot. to Strike Belated Affidavit) at 1, 6, because the Affidavit would not affect this Court's conclusions on admissibility and sufficiency.  In any event, for the sake of

completeness and as Plaintiff has not objected to the Motion, the Court will grant the Motion to

Strike as conceded.

## IV.     Conclusion

For the foregoing reasons, the Court will grant both Defendants' Motions for Summary

Judgment.  A separate Order so stating shall issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  May 3, 2023